UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 1:11-cr-22 |
| v. ) | |
| ) | *Mattice / Lee* |
| ) | |
| JAMES A. BURKE ) | |

## REPORT AND RECOMMENDATION

Before the Court is Defendant James A. Burke's ("Defendant") motion to suppress statements he made during a custodial interrogation and evidence seized during a warrantless search of his rental storage units [Doc. 21].[1] Defendant argues his statements should be suppressed because the waiver of his rights to silence and to counsel was involuntary, mainly due to coercive conditions and an inaccurate rendering of the warnings given pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). In addition, Defendant argues that he did not actually give consent for the warrantless search of his storage units. After considering the evidence and arguments, I **FIND** no constitutional violations and I **RECOMMEND** that Defendant's motion to suppress be **DENIED**.

**I.     FACTS**

Defendant was indicted on crack cocaine charges [Doc. 5]. At the November 9-10, 2011 evidentiary hearing on Defendant's motion to suppress, the Government offered the testimony of Tennessee Bureau of Investigation ("TBI") Special Agent Bryan Freeman ("Freeman"), Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Special Agent Brian Scott Musgrave

---

[1] The motion was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. 22]. The Government filed a response in opposition [Doc. 25]. An evidentiary hearing was held on November 9, 2011 and November 10, 2011. With the permission of the Court, post-hearing briefs were timely submitted by the parties [Doc. 31 & Doc. 32] and considered by the Court.

("Musgrave"), Tenth Judicial District Drug Task Force ("DTF") Agent Bill Cherry ("Cherry"), and DTF Agent Clay Moore ("Moore"). Defendant testified on his own behalf.

### A. Agents' Testimony

Taking the agents' relevant testimony as a whole, they testified to the following events and circumstances. Defendant had been under a joint investigation by the TBI, ATF and DTF for sometime for suspected drug activity. The investigation included the execution of a controlled buy involving Defendant. As part of the investigation, Cherry obtained a state warrant to search Defendant's home located at 1217 28th Street S.E., Cleveland, Tennessee, which was executed on March 3, 2011.

On that day, agents followed Defendant as he took his daughter to her school and then returned home. Upon Defendant's return home, around 8:28 a.m., law enforcement executed the search warrant. As Defendant was backing into his driveway, the "takedown" team of four law enforcement agents, including Moore, approached Defendant's car with weapons drawn. Agents shouted "police" and ordered Defendant to show his hands and to get out of his car. Defendant did not immediately show his hands and he was "helped" out of his car by agents. Defendant's hands were cuffed behind his back using multiple handcuffs (linked together to form a large enough restraining device due to Defendant's large size).

Agents told Defendant that they possessed a search warrant for his home and needed his keys or they would enter his home by force. Defendant gave the agents his keys and showed them which key would open the door to his house. An entry team of several officers began to search Defendant's home. In all, there were up to 14 agents engaged in various activities in or around Defendant's house that morning and there were at least five or six unmarked police cars present. The

2

agents were dressed in street clothes and most of them wore vests; some of the vests had agency designations such as ATF or TBI. The various agents' guns were holstered after the takedown.

Musgrave, who witnessed the takedown, and Freeman, the lead agent who arrived within a few minutes of Defendant being placed in handcuffs, introduced themselves to Defendant. They explained that they had a search warrant for Defendant's home, that they were looking for evidence of drug crimes, and that they wanted to talk to Defendant. Neither agent had his weapon drawn during this interaction with Defendant. Defendant did not resist in any way. Musgrave told Defendant the agents would tell the judge about his cooperation if he talked to them. At some point Musgrave talked to Defendant about whether he would need to interview Defendant's wife and he mentioned New Jersey, where Musgrave previously worked. Cherry, who oversaw the search, came by to show the warrant to Defendant and to take his picture.[2]

Prior to questioning Defendant, Freeman orally advised Defendant of his Miranda rights by reciting them from memory. At the hearing, Freeman recited the Miranda warnings he would typically give a suspect from memory as:

> Before we ask you any questions, you must understand your constitutional rights. You have the right to remain silent. Anything you say can and may be used against you in a court of law. You have the right to an attorney. If you cannot afford an attorney, one will be appointed to represent you without cost. If you decide to answer questions now without an attorney present, you still have the right to stop answering questions at any time until you talk to an attorney.

When asked how he obtained a Miranda waiver after such an oral advisement, Freeman testified he usually asks: "Are you willing to speak to me about this?"

The verbal warning given to Defendant took about 45 seconds and Defendant immediately

---

[2] Cherry gave Defendant a copy of the search warrant with an inventory after the search was completed.

waived his rights and stated he would talk. Musgrave and Cherry were present for Freeman's recitation of the oral warnings and heard Defendant state he understood his rights and was willing to talk to the agents. Freeman has 16 years of experience with the TBI and estimated that he had given oral Miranda warnings more than 1000 times. Musgrave, who has four years of ATF experience and has given around 100 oral Miranda warnings by reading a card he carries in his wallet, detected no flaws in the oral advice of rights given to Defendant by Freeman.

Freeman retrieved the form advice of rights and waiver document utilized by the TBI since at least 1989 (the "Form") from the notebook he had with him.[3] Freeman placed the Form on the vehicle next to Defendant so that Defendant and he could review the Form together. At the beginning of Freeman's contact with Defendant, Defendant's hands were handcuffed behind his back. Defendant's hands were moved to the front sometime prior to his signing the Form and

---

[3] The Form, Government's Exhibit 1 at the hearing, states:

### TENNESSEE BUREAU OF INVESTIGATION
### WARNINGS AS TO CONSTITUTIONAL RIGHTS

Before we ask you any questions, you must understand your constitutional rights:

> You have the right to remain silent, and you need not answer any questions;
> If you do answer questions, your answers can be used as evidence against you in court;
> You have the right to consult with a lawyer before or during questioning;
> If you cannot afford to hire a lawyer, one will be provided to you without cost;
> If you decide to answer questions now, without a lawyer present, you will still have the right to stop answering questions at any time until you talk to a lawyer.

### WAIVER
I have read, or have had read to me, my constitutional rights. I understand what my rights are, and I am willing to make a statement and answer questions without a lawyer being present.

4

Defendant remained handcuffed in front, a more comfortable position. Freeman reviewed the Form with Defendant and then Freeman gave Defendant time to read the Form himself.[4] None of the agents talked to Defendant while he read the Form. After spending a short time looking at the Form, Defendant stated he understood his rights, stated he was willing to waive his rights, and he signed the Form. After the Form was executed by Freeman and Defendant, Cherry signed the Form as a witness, noting the time as being 8:40 a.m.

In response to the questions posed mostly by Freeman, but also posed by Musgrave who returned to the interrogation soon after the Form was signed, Defendant confessed to possessing crack later found in his home and he admitted to drug dealing activities. When asked about his crack source, however, Defendant claimed he simply found the crack cookie which was discovered in the search of his home. Neither Musgrave or Freeman believed Defendant merely found the crack cookie.

The agents described their questioning of Defendant as mild-mannered, calm, and conversational, even when Freeman challenged Defendant's claim that he found the crack cookie. Defendant initially appeared to be surprised or shocked that a search warrant was being executed. Defendant did not, however, ever state that he could not understand his rights. The agents described Defendant as being calm throughout the interrogation, which took place over one and one-half hours. Most of the interrogation was conducted in the driveway, but Defendant was taken into the house toward the final quarter of the interrogation. Defendant was offered bathroom breaks and

---

[4] Musgrave was called into the house and was not present when the Form was presented and signed, but was present for the interrogation. Cherry was present when the Form was reviewed and signed, however, Cherry supervised the search and was not present for most of Defendant's interrogation.

beverages during the interrogation. None of the interview was recorded.

Near the conclusion of Freeman's interview, Cherry asked Defendant about paperwork located during the execution of the search warrant for storage units five and six at Keith Street Storage. He told Defendant the search warrant would not cover the storage units but that he wanted to search the units. Cherry told Defendant he would need a search warrant or Defendant's consent to search the units. Defendant admitted to renting the storage units, gave oral consent for a search of both units, and retrieved the keys to the units. Agents took Defendant to the units and, upon request of the agents, Defendant unlocked each unit for the search. Although Cherry had a written consent form for a search with him, he did not use the form with Defendant. Defendant never revoked his consent to search. No contraband was located in the units, but several assets, such as a motorcycle, were seized under a theory they were procured with illegal drug profits.

**B.    Defendant's Testimony**

Defendant testified as follows. As he was backing his car into his driveway upon returning from his daughter's school, he heard tires screech in front of him. He saw people running everywhere with guns drawn. He did not know the people were law enforcement officers as they did not identify themselves in any way. At least four people surrounded his car, shouting for him to show his hands, hitting the hood of his vehicle, and hitting his window with a gun. At first, he could not show his hands because he was trying to pull his emergency brake and shift into park so that his manual transmission car would not roll off a nearby ledge. The people threatened to break his window if he did not open it. The people "jerked" him from his car and twisted his arm behind his back and cuffed him. He was so nervous that he urinated himself, down his black sweat pants into his shoe. Defendant specifically said "fear" did not cause him to urinate– it was "nervousness."

6

The people told him to give them the key to his house or they would break the door down.

Freeman and Musgrave arrived a few minutes later. Defendant was leaning with his back on a car door. Freeman and Musgrave both began to talk to him and, at one point, Cherry walked up and took a picture of him and told him a lot of people did not like him. Musgrave accused Defendant of living a "lavish" lifestyle and said that he (Musgrave) was from New Jersey and that people living such a lavish lifestyle in New Jersey were selling drugs. Defendant responded, "Man, ain't no drugs or nothing sold." Musgrave then said they might have to interview Defendant's wife at her job and his mother-in-law. Defendant responded that they should not go to his wife's work because it could get her fired. Defendant was not told why the agents were at his house.

Defendant testified that Freeman probably said something to him about his rights, but because both Musgrave and Freemen were talking to him in a serial or ping-pong-like fashion, he could not focus on what Freeman was saying. Defendant agreed the agents were not yelling at him, but he said it was noisy because his dogs were barking and people were "running in the house." Defendant was also embarrassed because his neighbors were watching the commotion. Defendant explained that he could hear Freeman but he could not focus on what Freeman was saying because he was surprised, cold, wet, and in pain from his cuffs. As a result, he did not understand Freeman's advisement of his rights.

Freeman pulled a notebook out and put it on the car and showed Defendant a piece of paper and told him to sign the paper. Defendant signed the paper, identified at the hearing as the Form, because he was in handcuffs and thought he had to sign it. Defendant admits he can read and write, but said he only "glanced" at the paperwork before signing it. Later in his testimony, Defendant agreed he had an opportunity to read the Form and said he "probably" read over the Form, but did

7

not understand it. Also, while he could hear both Freeman and Musgrave, he could not pay attention due to the commotion. He never heard, understood or responded to a waiver request. Defendant admitted he had "heard rights before," was "familiar" with rights, and recognized Freeman from 1994.

Defendant did not tell Freeman that he did not understand his rights or the Form because he was too nervous and distracted – not because he was afraid. Defendant also never told anyone that he had urinated himself or that he wanted to change his wet pants. He never told anyone he was cold, even though he was. Defendant did not complain about his handcuffs during the interrogation. He did, however, complain when his hands were initially cuffed behind his back because the cuffs were too tight so they were hurting his wrists and hands, and his arm was painfully twisted behind his back. His thumb remained numb for two or three months after his arrest and he has a scar on his wrist from the cuff, but he agreed his wrist never bled on the day of his arrest. Defendant, who said he is five foot 11 inches tall, weighed close to 300 pounds at the time. Defendant does not recall being shown a search warrant and he did not read it.

Defendant identified a picture of himself at the storage unit. He said his handcuffs were only removed so he could unlock the unit. Defendant said he was not out of handcuffs for the ride to the storage units as Moore's testimony indicated. Contrary to Cherry's testimony, Defendant said he was not asked for consent to search the storage units and never gave consent. Instead, agents just jerked him up and took him to the location of the units where he was told to open the units.

### C. Credibility Finding

The agents' testimony about the events at issue is totally credible. The agents testified convincingly about fast-moving events with only minor inconsistencies in their testimony. In the

8

few instances where there were slight inconsistencies in the agents' testimony, such as the relative temperature that day and exactly when Defendant's handcuffs were removed, I will give Defendant the benefit of the doubt and find the weather was cold and Defendant was in handcuffs at all relevant times.[5]

Defendant's testimony was not credible where it diverged from the agents' account of events. For example, it is not credible that Defendant soaked his pants with his own urine all the way down to his shoes, but neither he nor the agents ever mentioned it – even once – during an interrogation that lasted well over an hour, a car ride to the storage units, or a search of the storage units. Considering just Defendant's own testimony, it was internally inconsistent. For example, he first claimed he only glanced at the Form and later admitted he "probably" read the Form. Accordingly, I **FIND** the agents' testimony to be an accurate account of the relevant events at issue in this motion.

## II.  ANALYSIS

Defendant seeks suppression of his incriminating statements arguing that he did not receive proper Miranda warnings and did not freely and voluntarily waive his Miranda rights before speaking with law enforcement officers. Specifically, Defendant argues suppression is required because he received a coercive and confusing combination of inaccurate oral and written Miranda warnings that did not convey the "essential constitutional components" required by *Miranda* [Doc. 21 at PageID#: 43]. Defendant also seeks to suppress evidence from the storage units arguing that because his statements must be suppressed, the search of the storage units is likewise improper. In addition, at the hearing, Defendant contended that he never gave consent for the search of the units.

---

[5] Even finding that Defendant, subjectively, was cold and in tight handcuffs, however, does not result in suppression under the totality of the circumstances.

### A. Statements

In order to protect a suspect's constitutional right against compelled self-incrimination, the Supreme Court gave birth to the now familiar "Miranda rights" and "Miranda warnings" by holding,

> [The subject] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation.

*Miranda*, 384 U.S. at 479.

The requirement to give Miranda warnings becomes applicable only when a person is subject to a custodial interrogation. *Hoffner v. Bradshaw*, 622 F.3d 487, 511 (6th Cir. 2010) (citing *Miranda*, 384 U.S. at 444). Here, it is undisputed that immediately upon contact with the agents in his driveway, Defendant was not at liberty to terminate the interrogation and leave, which makes the requirements of *Miranda* applicable.[6] As the requirement to give Miranda warnings was applicable, the Government must prove Defendant's waiver of his Miranda rights was voluntary, knowing, and intelligent. *See Berghuis v. Thompkins*, 130 S. Ct. 2250, 2261 (2010). Defendant's waiver must have been made in the absence of coercion and with "full awareness both of the nature of the right . . . and the consequences of the decision." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

"Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the

---

[6] A person is in custody when, given the circumstances surrounding the investigation, a reasonable person would have felt he was "not at liberty to terminate the interrogation and leave." *Id.* Factors in this analysis include "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010).

10

*Miranda* rights have been waived." *Id.* The waiver inquiry has "two dimensions: voluntariness and comprehension." *Garner v. Mitchell*, 557 F.3d 257, 263 (6th Cir. 2009) (en banc). Thus, a defendant may waive his right to counsel and right to silence only (1) if the waiver is voluntary—i.e., "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and (2) if it was knowing and intelligent—i.e., "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (quoting *Moran*, 475 U.S. at 421).

### 1. Voluntary

Defendant's "evidence" of coercive police activity is that he signed the Form "twelve minutes after fourteen police officers from four different agencies in tactical dress carrying tactical weapons overran the defendant's home, seizing and handcuffing him behind his back as he stood in his driveway. At least four or more of those officers surrounded the defendant while others entered his house en mass to invade the privacy of his home." [Doc. 21 at PageID#: 46]. In addition, Defendant contends he was coerced by the manner of questioning and his discomfort and confusion.

In response, the Government counters that "law enforcement did not use force in taking the defendant into custody; the defendant's interview occurred in his driveway and in his home, places familiar to the defendant; officers advised the defendant of his *Miranda* rights at least three times; and only two law enforcement officers were present during the interview. The defendant was allowed to have his cuffed hands in front of him, and the agents offered him beverages and bathroom breaks as needed. The agents were conversational and respectful during the interview." [Doc. 25 at Page ID #: 62].

11

In assessing whether a confession was made voluntarily, a court must determine, in the totality of the circumstances, whether the confession was the product of a suspect's unconstrained free will. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973). The government bears the burden to prove that the confession was voluntary by a preponderance of the evidence. *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999); *United States v. Wrice*, 954 F.2d 406, 410 (6th Cir.1992). While the government bears the burden of proof to show that a waiver of rights was voluntary, a defendant must first point to some evidence of improper police activity. *See United States v. Gatewood*, 230 F.3d 186, 193 (6th Cir. 2000) (admitting confession where defendant "failed to advance any evidence of coercive police activity").

A statement can be found involuntary only if it was motivated by coercive governmental conduct. *Colorado v. Connelly*, 479 U.S. 157, 164-167 (1986) (necessary predicate to finding a statement involuntary is that it was produced through coercive police activity); *United States v. Rutherford*, 555 F.3d 190, 195 (6th Cir. 2009) (some element of police coercion is always necessary); *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989) (same). There are three requirements for finding a confession involuntary due to police coercion: (1) the police activity was objectively coercive; (2) the coercion was sufficient to overbear a defendant's will; and (3) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *Mahan*, 190 F.3d at 422.

I **FIND** there is no credible evidence of objectively improper police activity in this case.[7] Although the oral advisements of rights was sufficient, the agents also provided a written advisement

---

[7] Although not explicitly argued by Defendant, I note that Musgrave's comment about informing authorities of any cooperation does not amount to coercion in this case. *See United States v. Stokes*, 631 F.3d 802, 808-09 (6th Cir. 2011).

12

of rights and allowed Defendant time to read the Form before interrogating Defendant. While there were multiple agents in the surrounding area, only two agents actively questioned Defendant. They did so in a calm and conversational manner without guns drawn in Defendant's own driveway and home. They offered Defendant bathroom breaks and beverages. Defendant, who admits he was familiar with Miranda rights, made a free and deliberate choice, not a choice resulting from any intimidation, coercion, or deception by the agents. Unfortunately for Defendant's argument, Miranda warnings are intended "not [to] protect[] people from themselves but [to] curb[] abusive practices by police officers." *Garner*, 557 F.3d at 262 (quoting *Rice v. Cooper*, 148 F.3d 747, 750-51 (7th Cir. 1998)).

In the absence of objectively coercive police activity, this Court need not consider the remaining two prongs of the *Mahan* standard. *See Connelly*, 479 U.S. at 167. However, I also **FIND** that there is no evidence to indicate any coercion overbore Defendant's will or that any coercion was the crucial motivating factor in the Defendant's decision to make incriminating statements.

Accordingly, I **FIND** the Government has met its burden to prove that Defendant's statements were voluntary by a preponderance of the evidence.

### 2. Knowing and Intelligent

Defendant contends his waiver of Miranda rights was not knowing and intelligent because he was not properly advised of his Miranda rights. First, he argues it was confusing to receive both oral and written advisements of his rights. Next, he complains about the choice of words used on the advice portion of the Form. Specifically, he claims the title on the Form,

TENNESSEE BUREAU OF INVESTIGATION
WARNINGS AS TO CONSTITUTIONAL RIGHTS

13

gives the impression that the rights at issue may be from the TBI and not the Constitution of the United States. He also complains, among other things, that the Form stated, a "right to consult with a lawyer before *or* during questioning;" and failed to properly state his right to have a lawyer present *during* questioning; . . . . (Emphasis added). Defendant argues that because the Form states "[i]f you cannot afford to hire a lawyer, one will be provided to you without cost;" and "[i]f you decide to answer questions now, without a lawyer present, you will still have the right to stop answering questions at any time until you talk, to a lawyer;" it fails to advise Defendant that a lawyer could be appointed prior to questioning and that a lawyer could be present during questioning. Defendant argues the Form improperly focuses on "questioning" and not "statements." Finally, Defendant argues the waiver section of the Form improperly uses the phrase "make a statement" causing confusion.

The Miranda warnings "ensure that a waiver of . . . rights is knowing and intelligent by requiring that the suspect be fully advised of [those rights], including the critical advice that whatever he chooses to say may be used as evidence against him." *Spring*, 479 U.S. at 574. The precise wording of Miranda warnings is flexible and "no talismanic incantation" is required to satisfy *Miranda*. *California v. Prysock*, 453 U.S. 355, 359 (1981). To determine the adequacy of given Miranda warnings, a court's "inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.'" *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) (quoting *Prysock*, 453 U.S. at 361). To determine whether a defendant understood his rights, courts examine the totality of the circumstances, including the suspect's age, experience, education, background, and intelligence.[8] *See United States v. Montgomery*, 621 F.3d 568, 573 (6th Cir. 2010).

---

[8] Defendant has not argued that any of these factors indicate he did not understand his rights.

Case 1:11-cr-00022-HSM-SKL   Document 33   Filed 11/30/11   Page 14 of 18   PageID #: 102

"An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

I **FIND** the oral and the written warnings, both together and separately, reasonably conveyed to Defendant his rights as required by *Miranda*. *See Eagan*, 492 U.S. at 203. None of Defendant's arguments concerning alleged deficiencies in the oral or written warnings he received, or the Form he signed, are supported by valid reasoning or authority.[9] The relevant question is not whether Defendant knew and understood every possible consequence of his waiver. Rather, the question is whether Defendant knew he could choose not to talk to the agents, to talk only with counsel present, or to discontinue talking at any time. *See Garner*, 557 F.3d at 261 (quoting *Spring*, 479 U.S. at 574). No credible evidence suggests that the oral or written Miranda warnings were defective or confusing or failed to provide Defendant with the requisite information he needed to relinquish his rights. I **FIND** that Defendant was adequately and effectively apprised of his rights as required by *Miranda* and he waived those rights.

Furthermore, looking at Defendant's less-than-credible testimony in the *most* charitable light, he, at best, *subjectively* failed to understand the Form after glancing at, or reading, it due to the surrounding commotion and his inability to focus. Although he now questions particular wording used in the Form, he did not testify that any such *wording* caused confusion when he signed the Form. Even if Defendant did not actually and fully understand the Miranda warnings – contrary to the credible evidence – Defendant told the agents that he understood his Miranda rights, waived his

---

[9] Defendant was given an opportunity to submit a post-hearing brief with authority to support his position that the wording of the Miranda warnings given to Defendant, either the oral or Form version, were inadequate. Defendant's post-hearing submission provided no such authority.

15

rights both orally and in writing, and then cooperated. Thus, I **FIND** he objectively indicated to the agents that he understood and waived his right to counsel and his right to silence.

A defendant's comprehension must be measured "primarily from the perspective of the police." *Garner*, 557 F.3d at 263. A waiver may be invalidated only if the police have a "contemporaneous reason" to doubt that a defendant understood his rights. *United States v. Al-Cholan*, 610 F.3d 945, 954 (6th Cir. 2010). Thus, "later-developed evidence" of a defendant's actual capacity to understand the warnings may be material, but only if it tends to show "that the police should have known that the defendant could not understand." *Garner*, 557 F.3d at 263. The rule stated in *Garner* recognizes that police simply cannot know or prove what a defendant subjectively knows or understands. *Id.* at 262 ("[T]he officers questioning [the defendant] had no way to discern the misunderstanding in [his] mind."). The burden rests on the government to prove a valid waiver because the *objective*, external evidence of a defendant's comprehension is accessible to the government. *See United States v. Garibay*, 143 F.3d 534, 538-39 (9th Cir. 1998) (analyzing whether a defendant knowingly waived his rights despite his poor language skills and applying a totality of the circumstances test consisting of objective factors such as whether the defendant "appeared to understand" his rights).

In the instant matter, the agents questioning Defendant simply had no reason to doubt his understanding of the Miranda rights and his waiver of those rights. Certainly, it might be a better practice to record such interrogations, as suggested by Defendant. There is no authority to require such a recording, however, and the failure to record the interrogation is just one circumstance to be considered in the totality of the circumstances. Defendant's testimony that he did not subjectively understand the Miranda warnings because of the commotion and his undisclosed discomfort, even if believed, is unavailing because there is no credible evidence the agents had any contemporaneous

16

reason to doubt his understanding. Defendant, by his own admissions, did not tell the agents he was allegedly cold or wet or distracted to the point of confusion.

After informing a suspect of his Miranda rights, police officers may infer that he has waived those rights from his subsequent willingness to answer questions, even if he has refused to sign a written waiver. *Berghuis*, 130 S. Ct. at 2261; *United States v. Eicher*, No. 90-1717, 1991 WL 29199, at *2 (6th Cir. Mar. 7, 1991). Certainly, in this case, the agents could reasonably rely on Defendant's oral and written waivers of his Miranda rights.

Accordingly, I **FIND** Defendant received proper Miranda warnings and knowingly and intelligently waived his rights. Thus, under the totality of the circumstances, I **CONCLUDE** that Defendant voluntarily, knowingly and intelligently waived his Miranda rights and there is no basis for suppressing his statements. *See Spring*, 479 U.S. at 573.

### B. Consent to Search

The Fourth Amendment prohibits a search without a proper warrant except in limited circumstances, such as consent. *Florida v. Royer*, 460 U.S. 491, 497 (1983); *Schneckloth*, 412 U.S. at 219. "It is the Government's burden by a preponderance of the evidence, to show through clear and positive testimony that valid consent was obtained." *United States v. Hinojosa*, 606 F.3d 875, 881 (6th Cir. 2010) (internal quotation marks omitted). Consent is valid only if it is voluntary – i.e., "unequivocal, specific and intelligently given, [and] uncontaminated by any duress or coercion." *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008). In determining whether a defendant's consent was voluntary, courts consider several factors, such as the characteristics of the accused, including his age, intelligence, and education; whether he understood the right to withhold consent; and whether he understood his constitutional rights. *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998). Courts also consider the details of the detention, including its length and nature, and the use

of coercive or punishing conduct by the police, as well as more subtle forms of coercion that might effect one's judgment. *Id.* at 402; *see also United States v. Crowder*, 62 F.3d 782, 787 (6th Cir. 1995) (considering factors).

Defendant initially argued that his consent to search was invalid because his statements were involuntary. At the hearing, however, Defendant testified he never gave consent and he seemingly abandoned his argument that his consent was improperly obtained. Even if this argument has not been abandoned, it fails for the same reasons Defendant's argument for suppression of his statements fails. Turning to the issue of consent, I **FIND** the Government has met its burden, by a preponderance of the evidence, to show through clear and positive testimony that a valid consent to search the storage units was obtained from Defendant. *See Hinojosa*, 606 F.3d at 881. Thus, there is no basis for suppressing evidence resulting from the search of the storage units.

### III.  CONCLUSION

For the reasons stated above, I **RECOMMEND**[10] that Defendant's motion to suppress [Doc. 21] be **DENIED**.

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[10] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).